## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SCANTIBODIES LABORATORY, INC.,

        Plaintiff,

-against-

CHURCH & DWIGHT CO., INC.,

        Defendant.

No:

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Scantibodies Laboratory, Inc. ("SLI"), by its attorneys Mandel Bhandari LLP,

for its complaint against Church & Dwight Co. Inc. ("C&D") alleges as follows:

### Summary of Claims

1.     For 19 years SLI supplied C&D and its predecessors with pregnancy and

ovulation test kits sold under the "First Response" and "Answer" brand names.

2.     Over the course of their multi-year relationship, SLI and C&D entered into

several contracts. The contracts at issue in this case are two exclusive supply and manufacturing

agreements for the supply of pregnancy and ovulation test kits executed by SLI and C&D in

2009 and 2010. The first, effective July 1, 2009, was for the supply of **non-digital** pregnancy

and ovulation test kits ("the 2009 Agreement"), and the second, effective June 1, 2010, was for

the supply of **digital** pregnancy test kits ("the 2010 Agreement" and together with the 2009

Agreement, the "Supply Agreements").

3.     SLI was C&D's exclusive supplier for many years. And with SLI's steady and

high-quality supply of products, C&D was the leader in the pregnancy test kit market. But in a

bid to find a lower-priced manufacturer, C&D reneged on its obligations under the Supply

Agreements by switching suppliers without giving SLI proper notice or reimbursing SLI for costs and expenses as required under the contracts.

4.      In 2013 – after C&D made the decision to switch suppliers – C&D deceived SLI by making intentional misrepresentations about C&D's future requirements. In reliance on these intentional misrepresentations, SLI spent over $1.1 million on raw materials that were never used and unnecessary equipment upgrades.

5.      In this action, SLI seeks to hold C&D responsible for its multiple willful breaches of the Supply Agreements and the significant damages it has caused SLI. In addition, SLI seeks a declaration that C&D materially breached its contractual obligations, entitling SLI to do business with C&D's competitors.

## PARTIES

6.      Plaintiff SLI is a California corporation with its principal place of business in Santee, California.

7.      Defendant C&D is a Delaware corporation with its principal place of business in Princeton, New Jersey.

## JURISDICTION AND VENUE

8.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that (a) Plaintiff is a resident of California and Defendant is a resident of Delaware and New Jersey, and (b) the matter in controversy exceeds $75,000, exclusive of interest and costs.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because (i) Section 18.2 of the Supply Agreements hold that "both Parties consent to the exclusive jurisdiction of the federal and state courts situated in the State of New York in the event of any

2

litigation involving this Agreement"; and (ii) the Defendant is subject to personal jurisdiction in the Southern District of New York because C&D has sufficient minimum contacts with New York and/or sufficiently avails itself of the markets in New York through its promotions, sales, and marketing within the state.

## FACTUAL ALLEGATIONS

### BACKGROUND

10.     Founded in 1976 by Tom and Cheryl Cantor, SLI is a privately-held biomedical manufacturing and clinical laboratory. Tom and Cheryl Cantor put their backgrounds in biochemistry and international studies into practical use by developing and manufacturing medical tests and their critical components for other manufacturers.

11.     Starting in 1995, SLI entered into an output agreement with Carter-Wallace, Inc. ("Carter-Wallace") whereby SLI became the exclusive supplier of pregnancy tests sold under the "First Response" brand name.

12.     In 2001, C&D acquired Carter-Wallace's consumer products division, which included the First Response line of pregnancy and ovulation test kits. After the acquisition, C&D continued to use SLI as the exclusive supplier of First Response pregnancy and ovulation test kits and, eventually, entered into its own exclusive supplier relationship with SLI. After working with SLI for several years and seeing the high-quality work that SLI was doing, C&D entered into the 2009 and 2010 Supply Agreements.

13.     Upon information and belief, sales for pregnancy test kits totaled over $220 million in 2012 – the last full year that C&D purchased all of its pregnancy test kits from SLI.

14.     C&D considers First Response to be one of C&D's eight "Power Brands," which represent approximately 80% of C&D's sales.

3

15.     In its 2012 annual report, C&D stated that "[i]n 2012, the Company's FIRST RESPONSE brand continued to be the number one selling brand in the home pregnancy and ovulation test kit business category. The Company also markets ANSWER, which competes in the value segment of the home pregnancy and ovulation test kit market."

16.     Upon information and belief, in 2012, "First Response" and "Answer" controlled over 30% of the pregnancy test kit market, making C&D the market leader.

## THE CONTRACTS AT ISSUE

17.     The 2009 Agreement had a term of five years with an automatic renewal for one additional year (concluding on July 1, 2015). The 2010 Agreement also had a term of five years with an automatic renewal for one additional year (concluding on June 1, 2016).

18.     According to Section 6.1 of the Supply Agreements, during the term of the Supply Agreements, C&D was obligated to deliver to SLI a non-binding blanket purchase order ("PO") for C&D's estimated requirement for the products over the period specified in such PO. This PO was referred to by SLI and C&D employees as the "rolling forecast." C&D was also obligated to furnish to SLI by the 15th of each month a production plan ("Production Plan") that would specify: (a) a one-month firm requirement for the following month against the then outstanding PO; (b) a second and third month tentative requirement; and (c) a nine-month non-binding estimated requirement. In return, SLI promised to deliver the quantities required by C&D by the end of the month or forty-five days after C&D's delivery of the Production Plan.

19.     For years, C&D provided its POs and Production Plans and SLI delivered high-quality products at the prices agreed to in the Supply Agreements. During this time, SLI supplied C&D with 100% of the pregnancy and ovulation test kits that C&D required.

4

20.     SLI worked hard to fulfill its obligations under the Supply Agreements. By 2013,
SLI had dozens of workers dedicated entirely to producing C&D's pregnancy and ovulation test
kits and was managing over 200 million parts per year.

21.     At just one factory in Tecate, Mexico, SLI employed over 140 workers who were
dedicated to working on C&D's pregnancy test kits. And – aside from training and hiring all
these workers – SLI made major investments in the factories and equipment needed to make
C&D's pregnancy kits.

22.     The Tecate workforce and SLI's other investments were made in reliance on
C&D's obligations under the Supply Agreements.

23.     C&D now contends that it had no obligation under the Supply Agreements to
order any products from SLI; C&D contends that Section 5 of the Supply Agreements allowed
C&D to reduce the quantity of products purchased from SLI from approximately 30 million
devices per year to zero.  C&D's contentions fail for several reasons, including but not limited to
the following:

> a. First, C&D did not have the right to stop ordering products from SLI during the
> term of the Supply Agreements, because Section 18.2 of the Supply Agreements
> states that the contracts shall be governed by New York law. Under New York
> law, C&D was obligated to order from SLI all of its requirements for products
> covered by the Supply Agreements because, among other things, Section 3 of the
> Supply Agreements contains an exclusive dealing provision, *i.e.,* SLI agreed that
> it would not provide any products or services to any of C&D's competitors
> without C&D's express written authorization. Indeed, pursuant to N.Y. U.C.C. §
> 2-306(2), not only was C&D under an obligation to place orders from SLI, but

5

C&D was also required to use its best efforts to promote the sale of the products that SLI could supply.

b. Second, there are at least five separate provisions of the Supply Agreements – Sections 4.2, 4.4, 6.4, 14.1 and 14.3 – that would be rendered meaningless if the contract were read to provide C&D with an absolute right to order products from suppliers other than SLI. A cardinal rule of contract interpretation is that an agreement cannot be read in such a way that renders one or more provisions in the contract meaningless. Therefore, these five provisions make plain that, absent extraordinary circumstances, C&D promised to purchase all of its required test kits from SLI for the term of the Supply Agreements.

## C&D'S PURCHASE HISTORY

24.     Between July 1, 2009 and June 30, 2010, SLI supplied C&D with [         ] non-digital pregnancy test kits for which it received [         ] in payments from C&D.

25.     Between July 1, 2010 and June 30, 2011, SLI supplied C&D with [         ] non-digital pregnancy test kits for which it received [         ] in payments from C&D.

26.     Between July 1, 2011 and June 30, 2012, SLI supplied C&D with [         ] non-digital pregnancy test kits for which it received [         ] in payments from C&D.

27.     Between July 1, 2012 and June 30, 2013, SLI supplied C&D with [         ] non-digital pregnancy test kits for which it received [         ] in payments from C&D.

28.     The following table summarizes the non-digital pregnancy test kits supplied by SLI and purchased by C&D, as alleged in the previous four paragraphs:

| Time Period | Non-Digital Pregnancy Test Kits Supplied | Payments from C&D |
|---|---|---|
| 7/1/2009 – 6/30/2010 | | |
| 7/1/2010 – 6/30/2011 | | |

6

| 7/1/2011 – 6/30/2012 | | |
| 7/1/2012 – 6/30/2013 | | |

29.   Between July 1, 2009 and June 30, 2010, SLI supplied C&D with [blank] non-

digital ovulation test kits for which it received [blank] in payments from C&D.

30.   Between July 1, 2010 and June 30, 2011, SLI supplied C&D with [blank] non-

digital ovulation test kits for which it received [blank] in payments from C&D.

31.   Between July 1, 2011 and June 30, 2012, SLI supplied C&D with [blank] non-

digital ovulation test kits for which it received [blank] in payments from C&D.

32.   Between July 1, 2012 and June 30, 2013, SLI supplied C&D with [blank] non-

digital ovulation test kits for which it received [blank] in payments from C&D.

33.   The following table summarizes the non-digital ovulation test kits supplied by

SLI and purchased by C&D as alleged in the previous four paragraphs:

| Time Period | Non-Digital Ovulation Test Kits Supplied | Payments from C&D |
|---|---|---|
| 7/1/2009 – 6/30/2010 | | |
| 7/1/2010 – 6/30/2011 | | |
| 7/1/2011 – 6/30/2012 | | |
| 7/1/2012 – 6/30/2013 | | |

34.   Between June 1, 2010 and May 31, 2011, SLI supplied C&D with [blank] digital

pregnancy test kits for which it received [blank] in payments from C&D.

35.   Between June 1, 2011 and May 31, 2012, SLI supplied C&D with [blank]

digital pregnancy test kits for which it received [blank] in payments from C&D.

36.   Between June 1, 2012 and May 31, 2013, SLI supplied C&D with [blank]

digital pregnancy test kits for which it received [blank] in payments from C&D.

7

37.     The following table summarizes the digital pregnancy test kits supplied by SLI

and purchased by C&D as alleged in the previous three paragraphs:

| Time Period | Digital Pregnancy Test Kits Supplied | Payments from C&D |
|---|---|---|
| 6/1/2010 – 5/31/2011 | | |
| 6/1/2011 – 5/31/2012 | | |
| 6/1/2012 – 5/31/2013 | | |

38.     It was anticipated that the sales volumes would have increased for the remaining

terms of the Supply Agreements.

## C&D BREACHES THE SUPPLY AGREEMENTS

39.     On October 25, 2013, two C&D representatives told SLI that it should "cease

manufacturing" under the Supply Agreements because C&D would "give a zero projection

forecast" and effectively stop purchasing SLI's products after December 31, 2013.

40.     At that meeting, C&D told SLI, in sum and substance, that eighteen years is a

long time to have the same supplier and that C&D believed it could save money by changing

suppliers.

41.     In fact, on January 8, 2014, C&D provided its final shipping order to SLI and

ceased purchasing pregnancy and ovulation test kits from SLI.

42.     C&D contends that it has not terminated either of the Supply Agreements.

43.     C&D contends that it has merely reduced to zero the quantity of its orders under

those Supply Agreements.

44.     However, as discussed above, the Supply Agreements do not allow C&D to

reduce the quantity of products purchased from SLI from approximately 30 million devices per

year to zero.

8

45.     And, as it turns out, C&D had been secretly plotting for months to reduce its orders from SLI to zero. C&D had dubbed its secret plan to breach the Supply Agreements "Project Pink." Upon information and belief, C&D had started buying its pregnancy and ovulation test kits from Syntron Bioresearch Inc. ("Syntron") even before January 8, 2014.

46.     In furtherance of its secret Project Pink, C&D made intentional misrepresentations to SLI about the rolling forecasts that it was obligated to provide under the Supply Agreements. These are discussed in greater detail below.

## C&D'S MISREPRESENTATIONS

47.     Pursuant to the Supply Agreements, C&D was to provide SLI with intermittent "rolling forecasts," and with monthly Production Plans that included 1-month, 2- and 3-month, and 9-month statements of C&Ds requirements. One purpose of these rolling forecasts and Production Plans was to permit SLI to acquire needed supplies and equipment ahead of time to meet C&Ds requirements.

48.     C&D was contractually obligated to prepare its rolling forecasts and Production Plans in good faith.

49.     It was reasonable of SLI to rely upon the rolling forecasts and the Production Plans in acquiring needed supplies and equipment.

50.     On or about December 17, 2012, C&D provided SLI with a rolling forecast of its requirements through December 2013. This was the final rolling forecast that C&D would ever provide to SLI.

51.     During 2013, C&D continued to provide monthly SLI with Production Plans and SLI continued to ask for 9-month rolling forecasts so that, among other things, SLI could ensure it had the equipment and raw materials necessary to meet C&D's needs.

9

52.     On April 23, 2013, SLI representatives visited C&D's facilities in New Jersey.
Among the SLI employees in attendance were Director of Manufacturing Jerry Sun (who was
responsible for meeting SLI's production deadlines and replenishing SLI's inventory), Suzie
Dollar (who had responsibility for customer service), Aida del Rosario (Production Planner) and
Raul Escasan (Manufacturing Manager). C&D employee Ed Coates told Jerry Sun that C&D
employees were working on a new 12-month rolling forecast. Upon information and belief, this
representation was false.

53.     At the same meeting, Ed Coates told Jerry Sun to keep on producing, and to keep
on purchasing inventory as SLI had always done, and not to change any routines because C&D
would continue to purchase test kits in 2014. This representation was false.

54.     SLI reasonably relied on Ed Coates's representation and purchased raw materials
and invested in equipment upgrades based on the understanding that C&D would continue to
purchase the test kits from SLI in 2014.

55.     On or about May 22, 2013, during a regularly scheduled weekly conference call
between SLI and C&D, Ed Coates stated to the SLI employees on the call, including Jerry Sun,
that C&D employees were working on a 12-month rolling forecast and that they anticipated
having it ready by June 15, 2013. Upon information and belief, this representation was false.

56.     During this same phone call, Ed Coates again told Jerry Sun to keep on
producing, and to keep on purchasing inventory as SLI had always done, and not to change any
routines because C&D would continue to purchase test kits in 2014. This representation was
also false.

10

57.     SLI reasonably relied on Ed Coates' representation and purchased raw materials and invested in equipment upgrades based on the understanding that C&D would continue to purchase the test kits from SLI in 2014.

58.     On or about June 17, 2013, Ed Coates sent Jerry Sun an email, stating that C&D intended to alter C&D's practices with regard to inventory. Specifically, Ed Coates stated that C&D intended to reduce their on-hand finished inventory from a 6-to-10-week supply, down to a 4-to-6-week supply. Upon information and belief, this representation was false

59.     Upon information and belief, Ed Coates made this June 17, 2013 representation in order to explain downward shifts in C&D's stated requirements in its monthly Production Plans. Upon information and belief, the true reason for the downward shifts in C&D's stated requirements was that, in breach of the Supply Agreements, C&D had begun purchasing pregnancy and ovulation test-kits from a supplier or suppliers other than SLI.

60.     But in reliance on this misrepresentation, SLI purchased raw materials and invested in equipment upgrades based on the understanding that C&D would continue to purchase the test kits from SLI until the end of the Supply Agreements.

61.     On or about August 14, 2013, during the regularly scheduled weekly conference call between SLI and C&D, Ed Coates stated to the SLI representatives on the conference call (Suzie Dollar, Aida, Del, Rosario, Raul Escasan, and Jerry Sun) that C&D was still working on the 12-month rolling forecast and that it would likely be completed in September 2013. Upon information and belief, this representation was false.

62.     On or about September 11, 2013, during the regularly scheduled weekly conference call between SLI and C&D, Ed Coates stated to the SLI representatives on the conference call (Suzie Dollar, Aida, Del, Rosario, Raul Escasan, and Jerry Sun) that C&D was

11

still working on the 12-month rolling forecast and that it would likely be completed within a few weeks. Upon information and belief, this representation was false.

63.     On September 17, 2013, Ed Coates emailed Jerry Sun that they were internally expecting an update on Friday, September 20, 2013 regarding when volume numbers would be available, permitting the completing of a 12-month rolling forecast. Upon information and belief, this representation was false.

64.     On September 24, 2013, Ed Coates emailed Jerry Sun that their internal volume numbers were not accurate or were incomplete, but that they expected to complete a 12-month rolling forecast the week of September 30, 2013. Ed Coates told Jerry Sun that he would at least attempt to get SLI a volume spreadsheet. Upon information and belief, this representation was false.

65.     On October 1, 2013, Sam Dragotta emailed Jerry Sun that C&D was having issues with the computer program that was supposed to generate the 2014 volumes and that they hoped to have their issues resolved within two weeks, after which a 12-month rolling forecast would be generated. Upon information and belief, this representation was false.

66.     On October 25, 2013, C&D informed SLI to cease all manufacturing by December 31, 2013.

67.     On or about December 14, 2012, January 16, 2013, February 15, 2013, March 15, 2013, April 16, 2013, May 17, 2013, June 16, 2013, July 16, 2013, August 16, 2013, September 16, 2013, October 15, 2013, November 12, 2013 and December 9, 2013, C&D employee Marianna Cady sent emails to SLI employees Juarez Olguin and Aida del Rosario (and copied other C&D and SLI employees) attaching C&D's required monthly Production Plans. As to each of these Production Plans sent prior to October 25, 2013, C&D represented that the Production

12

Plans represented its entire requirements for pregnancy and ovulation test kits during the period covered by the Production Plan. Upon information and belief, these Production Plans did not accurately represent C&D's entire requirements for pregnancy and ovulation test kits, because C&D was purchasing pregnancy and ovulation test-kits from a supplier or suppliers other than SLI during 2013.

## SLI IS DAMAGED BY C&D'S BREACHES

68.    Because C&D terminated the Supply Agreements without the 15 months' notice required by the Supply Agreements, SLI must scrap millions of dollars of inventory, specialized equipment, and accommodations that could only be used for the production of C&D's products. These scrapping costs include (but are not limited to) packaging components, supporting parts and equipment, product samples, antibodies, ascities, cell lines, reagent chemicals, triphasic materials, biphasic materials, housing components, and quality control testing materials.

69.    Section 6.3.2 of the Supply Agreements requires that C&D reimburse SLI for all reasonable scrapping costs directly related to the cessation of the manufacture of the products that were the subject of the Supply Agreements provided that SLI ordered such materials with the written consent of C&D.

70.    In this case, C&D approved the purchase of over $1.9 million in raw materials that would have been used for the manufacture of pregnancy and ovulation test kits but now must be scrapped.

71.    On January 16, 2014 and again on February 19, 2014, SLI offered to sell the raw materials to C&D.

72.    SLI was under no obligation to sell the raw materials to C&D but offered to do so as a show of good faith.

13

73. C&D could have potentially used some or all of these materials in connection with the production of First Response and Answer test kits that were being manufactured by C&D's new supplier.

74. C&D refused to purchase the materials and refused to reimburse SLI for the costs that SLI paid out-of-pocket for these materials.

75. SLI also invested over $1.2 million in equipment and improvements to comply with its obligations under the Supply Agreements.

76. C&D has refused to reimburse SLI for the equipment and improvements.

77. Because C&D breached its obligation to provide fifteen months' notice of termination, SLI was forced to close its Mexican facility without providing full notice to its employees. As a result of this sudden closure, SLI was obligated to make lump-sum payments to 147 of workers who manufactured C&D's products in SLI's Mexican plant. Thus, in December 2013, SLI paid its workers $471,719 in order to comply with Mexican labor laws. This was a direct and foreseeable result of C&D's breach of the Supply Agreements.

78. Section 16.4 of the Supply Agreements states that C&D is responsible for "any penalties or consequences occasioned by the violation or non-compliance with any laws" due to the actions of C&D.

79. The payments to SLI's workers were required because C&D did not give SLI fifteen months' notice, which would have given SLI time to arrange with the workers and other employers in the area to identify other employment for the workers.

80. Finally, C&D's breach of the Supply Agreements caused SLI to lose revenues and profits.

14

## CAUSES OF ACTION

### COUNT ONE
### BREACH OF CONTRACT
### (2009 SUPPLY AGREEMENT)

81.    Plaintiff re-alleges and incorporates by reference each and every allegation in

each and every preceding paragraph as if fully set forth herein.

82.    The 2009 Supply Agreement is a valid and enforceable contract.

83.    C&D and SLI both executed the 2009 Supply Agreement.

84.    SLI performed all its obligations pursuant to the 2009 Supply Agreement.

85.    C&D breached the 2009 Supply Agreement in, *inter alia*, the following ways:

   a.    Reducing to zero its orders under the 2009 Supply Agreement;

   b.    Not using its best efforts to promote the sale of SLI products covered by
         the 2009 Supply Agreement;

   c.    Not purchasing from SLI all of its requirements for products covered by
         the 2009 Supply Agreement

   d.    Not reimbursing SLI for scrapping costs for materials that SLI purchased
         in accordance with C&D's instructions;

   e.    Misrepresenting its requirements for products covered by the 2009 Supply
         Agreement, including by making numerous misrepresentations about
         rolling forecasts; and

   f.    Violating the covenant of good faith and fair dealing.

86.    As a direct result of these breaches, and other breaches detailed in this Complaint,

SLI has suffered damages in an amount to be determined at trial, but believed to be not less than

$20,000,000 plus prejudgment statutory interest of at least 9% per year.

15

87.     In addition, pursuant to Section 18.5 of the 2009 Supply Agreement C&D must

reimburse SLI for the cost and expense of this lawsuit including reasonable attorneys' fees.

## COUNT TWO
## BREACH OF CONTRACT
## (2010 SUPPLY AGREEMENT)

88.     Plaintiff re-alleges and incorporates by reference each and every allegation in

each and every preceding paragraph as if fully set forth herein.

89.     The 2010 Supply Agreement is a valid and enforceable contract.

90.     C&D and SLI both executed the 2010 Supply Agreement.

91.     SLI performed all its obligations pursuant to the 2010 Supply Agreement.

92.     C&D breached the 2010 Supply Agreements in, *inter alia*, the following ways:

    a.     Reducing to zero its orders under the 2010 Supply Agreement;

    b.     Not using its best efforts to promote the sale of SLI products covered by
the 2010 Supply Agreement;

    c.     Not purchasing from SLI all of its requirements for products covered by
the 2010 Supply Agreement;

    d.     Not reimbursing SLI for scrapping costs for materials that SLI purchased
in accordance with C&D's instructions;

    e.     Misrepresenting its requirements for products covered by the 2010 Supply
Agreement, including by making numerous misrepresentations about
rolling forecasts; and

    f.     Violating the covenant of good faith and fair dealing.

16

93.     As a direct result of these breaches, and other breaches detailed in this Complaint,

SLI has suffered damages in an amount to be determined at trial, but believed to be not less than

$20,000,000 plus prejudgment statutory interest of at least 9% per year.

94.     In addition, pursuant to Section 18.5 of the 2010 Supply Agreement C&D must

reimburse SLI for the cost and expense of this lawsuit including reasonable attorneys' fees.

## COUNT THREE
## DECLARATORY JUDGMENT

95.     Plaintiff re-alleges and incorporates by reference each and every allegation in

each and every preceding paragraph as if fully set forth herein.

96.     The Supply Agreements are enforceable contracts.

97.     C&D and SLI both executed the Supply Agreements.

98.     SLI performed all its obligations pursuant to the Supply Agreements.

99.     C&D breached the Supply Agreements in, *inter alia*, the following ways:

- a.     Reducing to zero its orders under the Supply Agreements;

- b.     Not using its use its best efforts to promote the sale of SLI products
  covered by supply under the Supply Agreements;

- c.     Not reimbursing SLI for scrapping costs for materials that SLI purchased
  in accordance with C&D's instructions;

- d.     Misrepresenting its requirements for products covered by the 2010 Supply
  Agreement, including by making numerous misrepresentations about
  rolling forecasts;

- e.     Not purchasing from SLI all of its requirements for products covered by
  the Supply Agreements; and

- f.     Violating the covenant of good faith and fair dealing.

17

100.   In accordance with Federal Rule of Civil Procedure, SLI seeks a declaratory

judgment that:  (1) C&D materially breached the Supply Agreements; (2) SLI is authorized to

sell its products and services to third parties that compete with C&D in the market for pregnancy

and ovulation test kits; and (3) pursuant to Section 18.5 of the 2010 Supply Agreement C&D

must reimburse SLI for the cost and expense of this lawsuit including reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff prays that this Court:

A.   Award nominal, compensatory, and punitive damages to Plaintiff in an amount to

be determined at trial but believed to be not less than $20,000,000.00;

B.   Award litigation costs and expenses to Plaintiff, including, but not limited to,

reasonable attorneys' fees;

C.   Issue a declaratory judgment in accordance with Count Four; and

D.   Award any additional and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable of right by Jury.

**DATED:**   New York, New York
April 1, 2014

By: _____

Evan Mandel

MANDEL BHANDARI LLP
Evan Mandel
Rishi Bhandari
11 Broadway, Suite 615
New York, NY 10004
T:  (212) 269-5600
F:  (646) 964-6667
em@mandelbhandari.com

*Attorneys for Scantibodies Laboratory, Inc.*

18