UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————

SCANTIBODIES LABORATORY, INC.,

Plaintiff,

- against -

CHURCH & DWIGHT CO., INC.,

Defendant.

————————————————————

14-cv-2275 (JGK)

MEMORANDUM OPINION
AND ORDER

JOHN G. KOELTL, District Judge:

The plaintiff, Scantibodies Laboratory, Inc. ("SLI"),
manufactured pregnancy test kits ("PTKs") and sold them to the
defendant, Church & Dwight Co., Inc. ("C&D") pursuant to two
contracts. Although the agreements did not require SLI to supply
all of C&D's requirements for PTKs, SLI argues that the import
of the agreements was that C&D was required to satisfy all of
its requirements for PTKs by buying them from SLI. When C&D
ceased ordering PTKs from SLI, SLI sued C&D for breach of those
contracts, and C&D filed counterclaims against SLI for
conversion and prima facie tort.

C&D and SLI have both moved for summary judgment on the
breach-of-contract claims, and SLI has moved for summary
judgment to dismiss the counterclaims. For the reasons stated
below, C&D's motion for summary judgment dismissing SLI's
breach-of-contract claims is **granted** and SLI's motion for
summary judgment on those claims is **denied**. SLI's motion for

summary judgment dismissing the counterclaims is **granted in part and denied in part**.

## I.

The standard for granting summary judgment is well established. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts which are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998). If there are cross motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law. Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of Am., 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012); see also Elastic Wonder, Inc. v. Posey, 179 F. Supp. 3d 307, 310 (S.D.N.Y. 2016). A court may grant summary judgment on a contract claim "when the contractual language is 'plain and unambiguous.'" Zurich Am. Ins. Co. v. ABM Indus., Inc., 397 F.3d 158, 164 (2d Cir. 2005) (quoting Brass v. Am. Film Techs., Inc., 987 F.2d 142, 148-49 (2d Cir. 1993)).

## II.

The following facts are undisputed except where noted.

In 1995, SLI entered into a contract with pharmaceutical and consumer-products firm Carter-Wallace, Inc., under which SLI provided Carter-Wallace with analog PTKs. Pl.'s 56.1 Stmt. ¶ 3. C&D acquired Carter-Wallace's consumer-products division in 2001 and continued to do business under the contract between Carter-Wallace and SLI. Id. ¶ 4; Def.'s 56.1 Stmt. ¶ 6. The contract required Carter-Wallace, and subsequently C&D, to purchase at least 90 percent of its PTKs from SLI. See Def.'s 56.1 Stmt. ¶ 7.

The 1995 contract remained in effect until July 2009, when C&D and SLI entered into a superseding contract for analog PTKs. Id. ¶¶ 4, 8; see Leader Decl. Ex. 1. The agreement had a five-year term. Def.'s 56.1 Stmt. ¶ 4. In June 2010, the parties entered into a substantively identical contract for digital PTKs,[1] also to last five years. Id. ¶ 5; see Leader Decl. Ex. 2. These contracts ("the Agreements") are the subject of this action. Both contracts contain a provision stating that they "shall be interpreted in accordance with, and governed by the laws of the State of New York." Leader Decl. Ex. 1 § 18.2.

---

[1] The 2009 and 2010 agreements are identical for all purposes material to this decision.

4

SLI contends that the Agreements are requirements contracts, obligating C&D to purchase all of its PTK requirements from SLI. C&D disagrees, arguing that the Agreements themselves contain no language or provisions that require C&D to purchase any quantity of PTKs from SLI, much less all of its requirements.

The Agreements contain no requirement that C&D purchase any fixed quantity of PTKs from SLI. Rather, the Agreements set out a forecast and production process as follows. C&D was required to, "[f]rom time to time during the [contractual period]," issue a nonbinding purchase order for its "estimated requirements" for an identified period. Id. § 6.1. C&D was obligated to issue to SLI a monthly production plan specifying (1) a one-month "firm requirement for the following month against the then outstanding [purchase order] . . . to be ready for delivery" by the end of the following month or within forty-five days, whichever is later; (2) "a second and third month tentative requirement"; and (3) a nonbinding, nine-month estimated requirement. Id. § 6.1.1. SLI was required to fulfill all purchase orders unless they deviated by greater than 10 percent from the amount of PTKs reflected in the first three months of the applicable production plan. Id. § 6.1.3. Prices for the products were set out in an Exhibit to the Agreements and there was a mechanism for SLI to change prices for the PTKs. Id. §§ 4.2.2, 4.2.3. Nothing in the

Agreements specified that, when following the order process, C&D was required to order any particular quantity of PTKs from SLI.

Between late 2011 and March 2012, C&D issued a request for proposal for the same PTKs that SLI supplied under the Agreements. Def.'s 56.1 Stmt. ¶¶ 52-53. SLI participated in the request for proposal, and in April 2012 provided C&D with a proposal covering January 2013 to December 2017. Id. ¶¶ 61-62. This proposal included reduced pricing and "[c]ontinued annual savings." Id. (alteration in original). C&D ultimately entered into an agreement for the assembly and packaging of PTKs with another company in December 2012. Id. ¶ 64. It also began its process of qualifying yet another company to provide the PTK housing materials. Id. ¶ 77; Pl.'s 56.1 Stmt. ¶ 45. Nonetheless, C&D allowed its 2009 Agreement with SLI to renew in March 2013 and continued to send monthly production plans to SLI. Pl.'s 56.1 Stmt. ¶¶ 51-52.

Representatives of C&D and SLI met in late October 2013. Id. ¶ 54. C&D's representatives stated that SLI did not win the request for proposal, that C&D was switching producers, and that SLI would receive a "zero forecast" after December 2013 — that is, C&D would cease ordering PTKs from SLI. Id.; Def.'s 56.1 Stmt. ¶ 130. According to SLI, a C&D representative added specifically that C&D was not terminating the contract. Pl.'s 56.1 Stmt. ¶ 55. C&D claims that no such statement was made.

6

Def.'s Opp'n 56.1 Stmt. ¶ 55. Nevertheless, C&D continued placing orders with SLI through December 2013. See Pl.'s 56.1 Stmt. ¶ 56.

SLI filed this lawsuit in April 2014, alleging that C&D breached the Agreements by reducing its orders to zero, purchasing PTKs from other producers, and failing to use best efforts to promote the sale of SLI's PTKs. See Compl. ¶¶ 85, 92. C&D answered SLI's Complaint and asserted counterclaims for conversion and prima facie tort, alleging that SLI refused to return C&D-owned equipment that SLI possessed despite C&D's attempts to retrieve it. See Def.'s Am. Answer ¶¶ 21-46.

At issue are the parties' summary judgment motions. C&D and SLI both move for summary judgment on SLI's breach-of-contract claims, and SLI additionally moves for summary judgment dismissing C&D's counterclaims.

### III.

### A.

The core issue is whether the Agreements are requirements contracts. SLI argues that the Agreements are requirements contracts that obligate C&D to purchase all of its PTK requirements exclusively from SLI. C&D argues that the Agreements impose no such obligation. The plain terms of the

Agreements as well as the clear parol evidence show that the Agreements are not requirements contracts.[2]

Under a requirements contract, the buyer must purchase all of its needs for a particular product during a particular period exclusively from the seller. See N.Y. U.C.C. § 2-306(1); Crown Battery Mfg. Co. v. Club Car, Inc., No. 12cv2158, 2014 WL 587142, at *3 (N.D. Ohio Feb. 14, 2014) (interpreting New York law); see also RBC Aircraft Prods., Inc. v. Precise Machining & Mfg., LLC, 26 F. Supp. 3d 156, 180 (D. Conn. 2014) (interpreting Connecticut law), rev'd on other grounds, 630 F. App'x 11 (2d Cir. 2015). Because the buyer cannot typically forecast its precise needs, quantity is not fixed at the time of contracting. But "the requisite mutuality and consideration for a valid contract is found in the legal detriment incurred by the buyer in relinquishing his right to purchase from all others except from the seller." RBC Aircraft, 26 F. Supp. 3d at 180 (quoting Propane Indus., Inc. v. Gen Motors Corp., 429 F. Supp. 214, 218 (W.D. Mo. 1977)).

---

[2] C&D argues that, regardless of whether the Agreements are requirements contracts, it is entitled to summary judgment because it properly terminated the Agreements. The Agreements provide that "three . . . or more defaults and/or breaches of warranties of this Agreement by SLI during any twelve . . . month period shall be grounds for immediate termination" by C&D. Leader Decl. Ex. 1 § 14.1. They also state that C&D could immediately terminate the Agreements "in the event of any material change in . . . management of SLI." Id. § 14.2. C&D claims that both of these events occurred and that it properly exercised its right to terminate the Agreements at the October 2013 meeting. Determining whether C&D actually terminated the Agreements at the meeting, and whether it had grounds to do so, would require resolving issues of fact that cannot be done on these cross motions for summary judgment.

A promise of exclusivity can be express or implied. Id.
Thus, "contracts which proclaim themselves to be requirements
contracts might not be . . . [and] contracts which do not
mention the term can be requirements contracts." Id. (alteration
in original) (quoting Ceredo Mortuary Chapel, Inc. v. United
States, 29 Fed. Cl. 346, 350 (Fed. Cl. 1993)). But this does not
render a contract's plain language irrelevant. If the contract
is unambiguous, then under New York law this Court interprets
its plain language as a matter of law. Vetromile v. JPI
Partners, LLC, 706 F. Supp. 2d 442, 447 (S.D.N.Y. 2010).
Contractual language is construed in light of the agreement as a
whole. Beal Sav. Bank v. Sommer, 865 N.E.2d 1210, 1213-14 (N.Y.
2007).

In this case, no language in the Agreements states or
implies that C&D must purchase PTKs exclusively from SLI.
Nothing in the Agreements' forecast and production process, as
described above, obligates C&D to purchase all of its
requirements exclusively from SLI. C&D could decide when to send
SLI a nonbinding purchase order for its estimated requirements;
the Agreements do not state that C&D must send purchase orders
for all of its estimated requirements, at all times, to SLI. And
although the Agreements required C&D to send SLI a binding
monthly production plan, nothing in the provision describing the
contents of a production plan obligated C&D to purchase any

particular quantity of PTKs per month, much less all of its requirements. See Crown Battery, 2014 WL 587142 at *4-5 (finding that a contract containing a provision that required the buyer to provide the seller with a forecast of its estimated product needs, but lacking a requirement that the buyer purchase any quantity of product, was not a requirements contract).

Moreover, the Agreements did not require that SLI supply all of C&D's requirements, a hallmark of requirements contracts. RBC Aircraft, 26 F. Supp. 3d at 180; see also Imtrac Indus., Inc. v. Glassexport Co., No. 90cv6058, 1996 WL 39294, at *6 n.3 (S.D.N.Y. Feb. 1, 1996) ("An agreement to supply 'substantially in the quantities required by [the buyer]' . . . is not a contract to provide 'all that [the buyer] may require' — language typical of requirements contracts."). SLI could reject C&D orders deviating more than 10 percent from the amount reflected in the first three months of an applicable production plan, and C&D could seek another supplier to fulfill those rejected orders. This provision is inconsistent with SLI's argument that C&D was required to purchase all of its PTK requirements from SLI. The basic framework of a requirements contract is that the buyer agrees to purchase all of its requirements from the seller and the seller agrees to meet those requirements. See N.Y. U.C.C. § 2-306(1); Crown Battery, 2014 WL 587142 at *3. In these contracts, SLI as the seller could refuse

to supply all of C&D's requirements if C&D's actual purchase orders were 10 percent more or less than its prior estimate.

Moreover, the Agreements' "Quantity Requirements" section contains no language requiring C&D to purchase all — or even a percentage — of its requirements exclusively from SLI. The section states only that "[C&D] will purchase from SLI, and SLI shall supply [C&D], such quantities of the [PTKs] as [C&D] shall order from time to time pursuant to" the Agreements. Leader Decl. Ex. 1 § 5. This language plainly does not require that C&D purchase all of its requirements from SLI. The fact that the Agreements did not specify a fixed quantity that C&D was required to purchase did not transform the Agreements into contracts that obligated C&D to purchase all of its requirements for PTKs from SLI. See Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc., 212 F.3d 373, 378 (7th Cir. 2000) (interpreting Illinois law) (noting the lack of a fixed quantity term in the contract at issue and holding that the contract was not a requirements contract); see also BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co., 804 F.3d 1229, 1232 (7th Cir. 2015) (interpreting Indiana law) (holding that a provision estimating the amount of product a buyer would request annually did not obligate the buyer to purchase any amount of product from the seller).

There is also no language in the "Supply and Purchase Requirements" section that requires C&D to purchase its requirements of PTKs exclusively from SLI. This section instead limits SLI's ability to supply third parties with competing products. See Leader Decl. Ex. 1 § 3.1. In short, the provisions of the Agreements where one would expect to find language requiring C&D to purchase all of its requirements for PTKs from SLI contain no such obligation. See Crown Battery, 2014 WL 587142 at *3-5 (finding, after analyzing various provisions of the contract at issue, that it lacked sufficient indications that it was a requirements contract).

## B.

SLI contends that two of the Agreements' provisions would be rendered superfluous if the Agreements were not requirements contracts: the "Meet and Release" provision and the "Alternate Supplier" provision. See Two Farms, Inc. v. Greenwich Ins. Co., 993 F. Supp. 2d 353, 360 (S.D.N.Y. 2014), aff'd, 628 F. App'x 802 (2d Cir. 2015) ("Courts interpreting contracts pursuant to New York law are required to give each word and phrase in a contract its plain meaning and avoid rendering the terms or provisions of a contract superfluous.").

## 1.

The "Meet and Release" provision provides that if C&D could purchase PTKs from another supplier at an overall lower cost

12

than that under the Agreements, C&D "may notify SLI of such total delivered cost and SLI will have an opportunity to price the [PTK] purchases" in a way that would "result in the same or lower total delivered cost." Leader Decl. Ex. 1 § 4.4 (emphasis added). After receiving notification of the lower price, SLI would receive thirty business days to match or beat the bid. Id. If it declined to do so, C&D could terminate the Agreements by providing SLI with twelve months' notice of its intention to purchase PTKs from the party offering a lower price. Id.

SLI claims that this provision would be superfluous if C&D were able to purchase PTKs from other suppliers in the first instance, and adds that C&D was thus required to follow the provision's procedure when moving production, which it failed to do. But the provision retains a purpose despite the Agreements' nonexclusivity: it provided a formal mechanism for C&D to stay with SLI, a familiar party, while obtaining prices that were competitive with the prices from other suppliers. The right to terminate upon twelve months' notice also retains a purpose: C&D had obligations under the Agreements other than purchasing and paying for PTKs. Among other duties, C&D had to submit monthly production plans to SLI, cooperate with SLI to implement an Internet-based collaborative planning system, and notify SLI of any relevant communications it received from the FDA or other governmental authorities. Id. §§ 6, 9, 10.6. C&D could have used

13

the Meet and Release provision to avoid these other obligations with twelve months' notice if SLI did not provide the same favorable price offered by another supplier. The provision was therefore not rendered superfluous by C&D's ability to purchase PTKs from third parties.

Moreover, SLI's insistence that C&D was required to follow the Meet and Release provision upon choosing to move production to another supplier is belied by the provision's discretionary language. The provision states that C&D "may notify SLI" that a competitor could provide PTKs at a lower cost. Id. § 4.4 (emphasis added). There was no requirement that C&D use the Meet and Release provision before C&D turned to another supplier for production of PTKs. "The words in the contract are given their ordinary, non-technical meaning." Lefrak Org. v. Chubb Custom Ins. Co., 942 F. Supp. 949, 952 (S.D.N.Y. 1996); see Claugus v. Roosevelt Island Hous. Mgmt. Corp., No. 96cv8155, 1999 WL 258275, at *11 (S.D.N.Y. Apr. 29, 1999) ("'May' does not mean 'must,' and thus the actions specified in the [contract] are permissive and not mandatory."). Nothing in the Agreements, which contain no language calling for C&D to purchase PTKs exclusively from SLI, suggests that the parties intended "may" to mean "must" and thus intended to limit C&D's ability to purchase PTKs from other suppliers.

The Agreements' "Alternate Supplier" provision provides that if SLI is unable to supply C&D for more than thirty days, C&D "may . . . purchase [PTKs] from a third party . . . during the remaining term of this Agreement, until such time as SLI can resume supplying [C&D] in a timely manner." Leader Decl. Ex. 1 § 6.4. SLI claims that this provision, too, would be superfluous if the Agreements allowed C&D to deal with other parties without restriction. See Granite Capital Holdings, Inc. v. Sherburne-Earlville Cent. School Dist., 924 N.Y.S.2d 182, 182 (App. Div. 2011) (holding that the plaintiff stated a claim for breach of a requirements contract in part because "the parties' agreement explicitly provide[d] for situations when defendant [could] purchase its fuel oil from other vendors, and such were not present").[3] But C&D convincingly argues that the provision remains significant in a nonexclusive agreement. The one-month firm orders contained in C&D's production plans were binding, requiring C&D to take and pay for the ordered PTKs. The

---

[3] While SLI relies on Granite Capital, that decision is distinguishable from this case. The contract in Granite Capital was formed in response to a set of bid documents that sought a requirements supply contract for fuel oil based upon the defendant's estimated annual fuel usage. Id. In addition, the contract required the supplier to maintain enough fuel oil to satisfy that estimate, id., and the record contained evidence indicating that the defendant was precluded from dealing with suppliers other than the supplier who won the bid, Brief for Plaintiff-Respondent at *18, Granite Capital, 924 N.Y.S.2d 182 (No. 510584). In this case, among many other differences, SLI knew that the contract did not prevent C&D from dealing with other suppliers because C&D sent out a request for proposal to supply PTKs during the term of the Agreements and SLI responded to that request.

Alternate Supplier provision allowed C&D to purchase PTKs from

another party if SLI were unable to cover such an order. It does

not, as SLI suggests, refer only to how C&D could move _all_ of

its orders to another party; nothing in the provision implies an

obligation that C&D purchase all of its requirements from SLI.[4]

### C.

Moreover, the parol evidence, while unnecessary to consult

because the Agreements are unambiguous, weighs strongly in C&D's

favor.

"Parol evidence may include exchanges between the

contracting parties during the course of negotiations, as well

as post-execution conduct of the parties in performing the

contract, admissions by the parties and – in appropriate

circumstances – industry usage or practice." Fitzpatrick v. Am.

Int'l Grp., Inc., No. 10cv142, 2013 WL 5427883, at *3 (S.D.N.Y.

Sept. 27, 2013). If the parol evidence is "so one-sided that no

reasonable person could decide the contrary," a court can

"resolve ambiguity in contractual language as a matter 'of

---

[4] At the argument of the pending motions, but not in its briefs, SLI argued that the existence of the termination provision in the Agreements would be superfluous if C&D was not required to purchase all of its PTKs from SLI. The argument is unpersuasive. C&D had ongoing obligations under the Agreements, including providing nonbinding estimated requirements and binding monthly production plans, as well as other requirements explained above such as an Internet-based collaborative planning system. It was wholly understandable that C&D included in the Agreements reasons for terminating the entire Agreements such as breaches of warranties and material changes in the ownership, control, or management of SLI. See Leader Decl. Ex. 1 §§ 14.1, 14.2.

law.'" 3Com Corp. v. Banco do Brasil, S.A., 171 F.3d 739, 746-47 (2d Cir. 1999) (quoting Bos. Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev., 768 F.2d 5, 8 (1st Cir. 1985)).

First, when negotiating the terms of the 2009 Agreement, SLI proposed that – like the 1995 agreement between SLI and Carter-Wallace – the 2009 Agreement should include a provision requiring C&D to purchase at least 90 percent of its PTKs from SLI. Def.'s 56.1 Stmt. ¶¶ 25, 27. In an email dated June 2, 2009, Kenneth Lemmer, the contract negotiator for C&D, responded to Allen Garrett, the SLI negotiator: "Under the 'Supply and Purchase Requirements' we will not commit to any particular quantity of product such as the 90% that was in the old agreement." Leader Decl. Ex. 15. Lemmer described the suggestion (and two others) as "show stoppers." Id. The provision was never included. SLI agreed to eliminate the requirement in exchange for changes related to the Meet and Release provision. Def.'s 56.1 Stmt. ¶¶ 31, 37; Pl.'s Opp'n 56.1 Stmt. ¶ 37; Leader Decl. Ex. 16. It is inconceivable that C&D rejected a 90-percent quantity requirement as a "show stopper" but nevertheless agreed to enter into a contract to purchase 100 percent of its PTK requirements from SLI.

Second, SLI participated in the request for proposal C&D issued between late 2011 and early 2012. Def.'s 56.1 Stmt. ¶¶ 60-62. SLI's proposal included reduced prices for three years

17

and continued annual savings for another two. Id. ¶ 62. Further, SLI emailed C&D requesting "some security for [C&D's] business," and SLI's Controller/Director of Finance sent an internal email referring to SLI's proposal as "aggressive enough to maintain [C&D's] business." Id. ¶¶ 61, 63. This course of conduct reflects that SLI was well aware that C&D was not required to continue purchasing PTKs from SLI under the existing Agreements and SLI attempted to obtain "some security" with its new proposal to C&D.

Finally, SLI representatives said nothing about exclusivity when, during the October 2013 meeting, they learned that SLI did not win the request for proposal. Nor did the SLI representatives object when C&D representatives stated that C&D would soon be moving its business and setting its SLI forecast to zero. It was not until nearly two weeks later that SLI expressed, in an email to C&D, that it "[could not] believe that [C&D was] not going to perform under [the Agreements]." Leader Ex. 93. Despite this objection, SLI continued supplying C&D with PTKs for another couple of months. See Pl.'s 56.1 Stmt. ¶¶ 54–57. These circumstances further belie an understanding between the parties that the Agreements were requirements contracts.

**D.**

SLI also claims that C&D breached an implied "best efforts" obligation, see N.Y. U.C.C. § 2-306(2), by unilaterally ceasing

to order PTKs from SLI. Under New York law, an agreement for "exclusive dealing" imposes, "unless otherwise agreed[,] an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." Id. "[T]he duty to use best efforts applies only to buyers who receive the benefit of an exclusive commitment from a supplier. . . ." MDC Corp. v. John H. Harland Co., 228 F. Supp. 2d 387, 392 (S.D.N.Y. 2002). The relevant inquiry, therefore, starts with whether the Agreements bound SLI to provide only C&D with PTKs. In making this determination, courts "focus[] on the hold that one commercial party has over another in a particular market." Id. at 394.

SLI argues that the Agreements prohibit it from selling PTKs and competing products to parties other than C&D, thus qualifying the Agreements as "exclusive dealing" contracts and triggering N.Y. U.C.C. § 2-306(2)'s best efforts duty. See MDC Corp., 228 F. Supp. 2d at 394. SLI points to the Agreements' "Supply and Purchase Requirements" section, which reads:

> During the Term neither SLI or its Affiliates . . . shall manufacture, distribute, sell or supply to a third party, other than pursuant to existing third party arrangements in effect as of the Effective Date, any products and/or provide any services to a third party that are or would be competitive with any Products containing [C&D's] Intellectual Property as defined herein without the express prior written authorization of [C&D] in its sole and absolute discretion.

Leader Decl. Ex. 1 § 3.1. This provision, SLI contends, provided C&D with effective control of SLI's PTK business and thus obligated C&D to sell as many of SLI's PTKs as possible.

C&D counters that it and SLI "otherwise agreed," see N.Y. U.C.C. § 2-306(2), that the Agreements would not contain a best efforts requirement. New York U.C.C. § 2-306(2) allows parties to agree to waive a best efforts obligation. The parties in this case did just that.

During negotiations, SLI sought to include in the 2009 Agreement a requirement that C&D purchase 90 percent of its PTKs from SLI. Not only did C&D explicitly reject this requirement but, as discussed above, the Agreements as ultimately written imposed no obligation that C&D purchase any particular percentage of its PTKs from SLI. A best efforts obligation cannot arise in this setting. C&D was under no duty to sell as many of SLI's PTKs as possible. By acquiescing to contracts without the 90-percent provision — or any set quantity requirement — SLI effectively waived a right to C&D's best efforts. See Gerard v. Almouli, 746 F.2d 936, 939 (2d Cir. 1984) ("[I]t would be improper to read into the contract a contradictory sales requirement."); E. Elec., Inc. v. Seeburg Corp., 427 F.2d 23, 27 (2d Cir. 1970) ("It is surely of some significance in deciding whether an agreement contains an

implied obligation that the party so arguing tried to make the obligation explicit and failed.").

In addition, the Agreements allowed SLI to reject C&D orders deviating more than 10 percent from an applicable purchase-plan estimate. If SLI exercised that right, C&D could not be expected to forgo ordering PTKs from other parties, so that it could meet its own customers' demands. That would be inconsistent with an obligation to use best efforts to promote SLI's PTKs. Finally, the Agreements contain no explicit best efforts requirement but do contain a merger clause stating that the terms as written constitute the entirety of the Agreements. This merger clause negates any implication of a best efforts requirement. See Permanence Corp. v. Kennametal, Inc., 908 F.2d 98, 102 (6th Cir. 1990) (finding that a merger clause negated the implication of a best efforts obligation); Aventis Envtl. Sci. USA LP v. Scotts Co., 383 F. Supp. 2d 488, 506 (S.D.N.Y. 2005) (same). In sum, C&D and SLI otherwise agreed that the Agreements imposed no best efforts obligation upon C&D.

*          *          *

In short, the Agreements lack the hallmarks of requirements contracts and their provisions are consistent with their being nonexclusive. The relevant parol evidence corroborates this. Accordingly, because the Agreements are not requirements contracts, C&D did not breach them by setting its orders with

21

SLI to zero and contracting with other parties. Moreover, the parties "otherwise agreed" that C&D was under no best efforts obligation to sell SLI-manufactured PTKs, and therefore C&D did not breach the Agreements by failing to carry out such a duty. For these reasons, C&D's motion for summary judgment dismissing SLI's breach-of-contract claims is **granted** and SLI's motion for summary judgment on those claims is **denied.**

IV.

SLI moves for summary judgment dismissing C&D's counterclaims. C&D's counterclaims for conversion and prima facie tort are based on its allegation that SLI refused to return C&D-owned manufacturing equipment that, as required by the Agreements, see Leader Decl. Ex. 1 § 17, was located in SLI's facilities. C&D contends that it made repeated attempts to retrieve its equipment – even sending agents to an SLI facility in Mexico, where SLI refused them entry – starting in December 2013 and continuing until SLI agreed to release the equipment in September 2014. Def.'s Opp'n 56.1 Stmt. ¶¶ 75-81. C&D claims that SLI's improper withholding and delayed return of C&D's equipment damaged C&D. Id. SLI, on the other hand, claims that it discussed the equipment's return with C&D but C&D failed to make arrangements to retrieve the equipment. Pl.'s 56.1 Stmt. ¶¶ 75-78. According to SLI, it was only after SLI threatened to

charge C&D a storage fee that C&D made the arrangements necessary to retrieve the equipment. Id. ¶¶ 79-80.

Under New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006) (alteration in original) (quoting Vigilant Ins. Co. of Am. V. Hous. Auth. Of El Paso, 660 N.E.2d 1121, 1126 (N.Y. 1995)). "Where the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property." Schwartz v. Capital Liquidators, Inc., 984 F.2d 53, 54 (2d Cir. 1993) (quoting Johnson v. Gumer, 464 N.Y.S.2d 318, 319 (App. Div. 1983)). A conversion claim is barred if a valid and binding contract covers the claim's subject matter. Mariah Re Ltd. v. Am. Family Mut. Ins. Co., 52 F. Supp. 3d 601, 620 (S.D.N.Y. 2014), aff'd sub nom., 607 F. App'x 123 (2d Cir. 2015).

As SLI points out, the Agreements contain a provision pertaining to C&D's equipment. See Leader Decl. Ex. 1 § 17. But the provision simply states that certain C&D equipment will be located at SLI facilities, labeled as owned by C&D, and kept in good operable condition at SLI's expense. Id. The provision does not cover the subject matter of C&D's conversion claim and

23

accordingly does not prohibit it. Additionally, there are issues of fact as to whether SLI improperly delayed the return of C&D's equipment and thereby damaged C&D. SLI's summary judgment motion as it relates to C&D's conversion claim is accordingly **denied**.

However, C&D's prima facie tort claim must be dismissed because it is duplicative of its conversion claim. It is based on the same facts underlying its conversion claim, and the thrust of the harm alleged is the same. See generally Def.'s Am. Answer ¶¶ 21-46. "A cause of action sounding in a known or recognized tort . . . should not, and indeed cannot, be characterized as a prima facie tort." Long v. Beneficial Fin. Co. of N.Y., 330 N.Y.S.2d 664, 668 (App. Div. 1972); see also Epifani v. Johnson, 882 N.Y.S.2d 234, 241 (App. Div. 2009) ("Prima facie tort was designed to provide a remedy for intentional and malicious actions that cause harm and for which no traditional tort provides a remedy, and not to provide a catch all alternative for every cause of action which is not independently viable."). Accordingly, SLI's motion for summary judgment dismissing C&D's prima facie tort claim is **granted**.

### CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. As explained above, C&D's motion for summary judgment dismissing SLI's breach-of-contract

claims is **granted,** and SLI's motion for summary judgment on those claims is **denied.** SLI's motion for summary judgment dismissing C&D's counterclaims is **granted in part and denied in part.** The Clerk of the Court is directed to close Docket numbers 264 and 265.

**SO ORDERED.**

Dated:    New York, New York
          September 19, 2018

                                    John G. Koeltl
                              United States District Judge